932 F.2d 891
 SANGRE DE CRISTO DEVELOPMENT COMPANY, INC., A New Mexico
Corporation, Plaintiff-Appellant,
Jennie Deden Behles, Trustee in Bankruptcy for Sangre de
Cristo Development Company, Inc., Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 89-2238.
 United States Court of Appeals,
Tenth Circuit.
 May 7, 1991.
 
 Michael D. Bustamante (Arturo B. Ortega, with him on the briefs), Albuquerque, N.M., for plaintiffs-appellants.
 Jeffrey P. Kehne, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C. (Richard B. Stewart, Asst. Atty. Gen., Land & Natural Resources Div., Washington, D.C., John A. Bryson, Atty., Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., William L. Lutz, U.S. Atty., Albuquerque, N.M., Herbert A. Becker, Asst. U.S. Atty., Albuquerque, N.M., James E. Brookshire, Peter Monson, Attys., Dept. of Justice, Criminal Div., Appellate Section, Washington, D.C., Michael P. Healy, Atty., Dept. of Justice, Washington, D.C., with him on the brief), for defendant-appellee.
 Before LOGAN, ANDERSON, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 Appellants seek damages against the United States for harm suffered when the Department of the Interior allegedly cancelled a lease agreement reached between the appellants and the Tesuque Indian Pueblo. The appellants claim that the alleged lease cancellation by the Department of the Interior deprived them of a vested property interest and as a result entitles them to recover just compensation under the takings clause of the Fifth Amendment. In addition, the appellants claim that the United States is liable under contract and trust theories. The appellants have raised a battery of additional claims against the United States arising out of the lease, the viability of which depends upon whether the United States has waived its sovereign immunity. Finally, the appellants further allege that the United States negligently prepared an environmental impact statement, which prejudiced the appellants' ability to avail themselves of their rights under the lease.
 
 
 2
 The United States District Court for the District of New Mexico found for the United States on all the appellants' claims. The district court held that because the Department of the Interior's actions did not deprive the appellants of a vested property interest, the appellants' Fifth Amendment just compensation claim was without merit. The district court also held that the United States was not liable for the lease under either a breach of contract or a breach of trust theory. The district court further held that Congress did not waive the United States' sovereign immunity with respect to a number of miscellaneous claims filed by the appellants and, therefore, dismissed them. Finally, the district court held that the Department of Interior had not negligently prepared the environmental impact statement. We affirm.
 
 FACTS
 
 3
 In 1968, a number of Santa Fe, New Mexico residents came up with the idea to develop a world class golf course and residential community near Santa Fe on lands owned by the Tesuque Indian Pueblo ("Pueblo"). These individuals formed the Sangre de Cristo Development Company, Inc. ("Sangre"). Sangre negotiated with the Pueblo and on April 17, 1970, the Pueblo and Sangre signed a lease. The lease involved a total of approximately 5000 acres of Pueblo land, some of which were to be developed immediately while the remainder were to be leased pursuant to a series of option agreements contained in the lease. The lease was approved by the Department of the Interior ("Department") on May 2, 1970, as required under 25 U.S.C. Sec. 415(a) (1970).
 
 
 4
 In May of 1971, Sangre began selling residential lots. On October 21, 1971, two neighboring landowners and two nonprofit environmental groups, seeking to enjoin construction, filed suit against the United States. They claimed that the United States' approval was invalid because no environmental impact study had been undertaken prior to the approval, and they requested an injunction prohibiting the United States from taking further action or granting further approvals pursuant to the lease until a proper environmental study had been completed. The district court denied the request for injunctive relief on the grounds that no study was required under the National Environmental Policy Act ("NEPA"), Pub.L. No. 91-190, 83 Stat. 852 (1970) (codified at 42 U.S.C. Secs. 4321 et seq.). We reversed, holding that the Secretary's approval constituted a major federal action under NEPA which triggered the environmental impact study requirement of Sec. 4332(2)(C). Davis v. Morton, 469 F.2d 593, 597 (10th Cir.1972). We remanded to the district court with instructions that it grant the relief requested by the neighboring landowners and environmental groups and enjoin the United States "from approving, allowing or acting in any way on submissions or approvals required or permitted under the lease agreement until the environmental impact of the project had been studied and evaluated." Id. at 595. The injunction issued on January 31, 1973.
 
 
 5
 Over the course of the next four and one-half years, a number of entities, including the Bureau of Indian Affairs ("BIA"), the Council on Environmental Quality ("CEQ"), the Assistant Solicitor for Environmental Law, and Sangre, worked to prepare the environmental impact statement ("EIS"). In early 1976, the Pueblo, under new tribal leadership, began to express reservations regarding the lease. By April of 1976, the Pueblo formally requested that the Department void the lease. On August 25, 1977, the Department announced that it would rescind its prior approval of the lease based upon environmental considerations as well as the Pueblo's opposition to the lease. On October 26, 1977, Sangre was subjected to involuntary bankruptcy proceedings. The trustee of Sangre's estate has brought this civil action on behalf of the estate.
 
 DISCUSSION
 
 6
 Part I of this opinion will address Sangre's claim of a wrongful taking under the Fifth Amendment of the Constitution. Part II will address Sangre's breach of contract/breach of trust claims based upon a purported trust relationship between the Pueblo, the United States, and Sangre. Part III will address whether the United States waived its sovereign immunity with respect to a number of miscellaneous claims raised by Sangre. Part IV will address whether the Department negligently prepared the EIS.I
 
 
 7
 Sangre argues that when the Department "rescinded" its approval of the lease on August 25, 1977, that this action constituted a taking under the Fifth Amendment, thereby entitling Sangre to recover "just compensation." As Sangre admits in its brief, for it to be successful on this argument, it must prevail on two separate points: (1) that at the time the alleged taking occurred, Sangre had a vested interest protectable under the Fifth Amendment; and (2) that the Department's action constituted a taking under the Fifth Amendment. See In re Consol. United States Atmospheric Testing Litig., 820 F.2d 982, 988 (9th Cir.1987), cert. denied, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988). Because we hold that Sangre did not possess a vested interest in the lease at the time the Department rescinded its approval, we need not address the issue of whether the Department's action constituted a taking.
 
 
 8
 In Davis v. Morton we instructed the district court to grant the relief requested by the environmental groups and the neighboring landowners: "the case is remanded to the trial court with directions to grant the relief prayed for." Davis, 469 F.2d at 598. The relief requested by the environmental groups and the neighboring landowners was
 
 
 9
 to issue a preliminary and permanent injunction enjoining [the United States] from approving, allowing or acting in any way on submissions or approvals required or permitted under the lease agreement until the environmental impact of the project had been studied and evaluated. [The environmental groups and the neighboring landowners] further requested the court issue a Writ of Mandamus requiring [the United States] to follow mandates of NEPA before taking any future action on the Pueblo lease.
 
 
 10
 Id. at 595. Sangre contends that this language indicates that we did not invalidate the lease, but that we simply enjoined the project from continuing until the NEPA requirements were fulfilled. We disagree. We held that the initial approval of the lease by the Department was invalid because it was not preceded by the requisite environmental study. That the requested relief only sought an injunction against future action did not narrow the holding that the lease itself had never been validly approved.
 
 
 11
 In order for the lease to have been valid, the Department's approval was required:
 
 
 12
 Any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential or business purposes.... All leases so granted shall be for a term of not to exceed twenty-five years, except leases of land on the ... pueblo of Tesuque ... which may be for a term of not to exceed ninety-nine years....
 
 
 13
 25 U.S.C. Sec. 415(a) (1970). Further, not just any Departmental approval would suffice--the approval must have been a valid approval. See Gray v. Johnson, 395 F.2d 533, 537 (10th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968), where we held that when the BIA approved a lease that was contrary to regulations and not in the best interest of the Indian lessors, the lessee never acquired a vested interest in the lease. In Gray we said, "[a]ctions by the local agency contrary to the regulations and contrary to the best interest of the Indian do not create a vested interest in the lease. Agents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are so acting." Id. See also Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) (holding that the government is not bound when its agent enters into an agreement that falls outside the agent's Congressionally delegated authority). In Davis we agreed with the environmental groups and the neighboring landowners that the Department was "without authority to grant the lease since no environmental impact study was conducted prior to approval of the lease as required by NEPA...." Davis, 469 F.2d at 594.[1] Because we read 25 U.S.C. Sec. 415(a) as requiring a valid approval from the Department in order for the lease contract to have legal effect, the invalid lease contract between Sangre and the Pueblo vested no property interest in Sangre.
 
 
 14
 The Department's August 25, 1977 action, regardless of whether it is referred to as a recision or merely a failure to approve, did not divest Sangre of a leasehold interest because Sangre's interest never vested in the first place. Therefore, we affirm the district court's dismissal of Sangre's Fifth Amendment takings claim.
 
 II
 
 15
 Sangre contends that the United States is liable because it breached the lease. Sangre claims that the United States, by virtue of its pervasive involvement in the contract, became a party to the contract. Sangre attempts to strengthen its breach of contract claim by arguing that the United States is liable because it acted as a trustee.
 
 
 16
 The first step is to determine the nature of the relationship between the parties involved in the lease agreement. Clearly, the Pueblo was the lessor and Sangre was the lessee. The United States had no property interest in the Pueblo's land. The United States was involved only because its approval was required under 25 U.S.C. Sec. 415(a). Nowhere in Sec. 415 does Congress indicate that the United States is to act as a party to a lease contract between an Indian tribe and a lessee. Section 415 is no different than many other federal statutes that require federal approval of private agreements. We reject the argument that such statutes render the United States a party to agreements reached between private contracting parties merely because its approval is required before the agreements become effective.
 
 
 17
 Sangre attempts to bolster its breach of contract claim by blending in a breach of trust claim. Sangre claims that the United States acted as a trustee for the Pueblo throughout the contract negotiations and therefore, became liable to Sangre under a breach of trust theory. However, the United States can only be held liable to Sangre if the United States somehow contracted with Sangre on behalf of the Pueblo. See G. Bogert, The Law of Trusts and Trustees Sec. 712 (Rev.2d ed. 1982). The United States never entered into a contract with Sangre on behalf of the Pueblo. The parties agree that the Pueblo owned the land, that the Pueblo signed as the lessor, and that Sangre signed as the lessee. As noted, supra, the United States simply approved the lease.
 
 
 18
 Sangre argues that the United States did not have to sign the lease on behalf of the Pueblo because the Pueblo owned legal title due to an historic anomaly. Therefore, Sangre contends that we should not reject its breach of trust claim merely because the United States did not technically sign the lease agreement as a trustee. However, even if the United States had signed the lease as trustee for the Pueblo, that fact alone would not render the United States liable to Sangre.
 
 
 19
 In United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939), the Court held that the United States is not liable to third parties when it contracts with them on behalf of Indian tribes. Id. at 423, 59 S.Ct. at 271. In Algoma a timber company had entered into a logging contract with the Klamath Indians. The contract was " 'between the Superintendent of the Klamath Indian School,[2] for and on behalf of the Klamath Indians, party of the first part' and the Lumber Company, 'party of the second part.' " Id. at 421, 59 S.Ct. at 270. The contract was approved by the Department of the Interior. Payments for the timber were actually deposited into the United States Treasury for the benefit of the Indians. The lumber company ultimately claimed it had overpayed for the timber and it sued the United States as signatory on the contract to recover the overpayment. Although the facts weighing in favor of holding the United States liable in Algoma were stronger than in the instant case, the Court refused to extend liability to the United States because it was clear that the United States was acting for the benefit of the Klamath Indians. The Algoma opinion represents the Court's rejection of the trust theory of liability as a means of holding the United States contractually liable to third parties when it acts on behalf of Indians.
 
 
 20
 Sangre argues that the Court's more recent decision in United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) overruled Algoma. In Mitchell, the Court held that the United States was involved in a "limited trust" relationship with the Quinault Indians[3] and thus, was liable to the tribe for mismanaging its timber resources. Id. at 226, 103 S.Ct. at 2972. Although the Court relied upon a "limited trust" theory to hold the United States liable to the Indian tribe, it was not presented with the issue of whether the United States can be held liable to third parties who, with the United States' approval, contract with Indian tribes. Significantly, we note that the Court never even mentioned Algoma in its Mitchell opinion. Because we decline to accept Sangre's invitation to read Mitchell as overruling Algoma, we reject Sangre's breach of trust claim.
 
 
 21
 Further, as we held in Part I, the United States' initial approval of the lease was invalid because the applicable NEPA requirements had not been met. Therefore, even if the United States' signature could have rendered it liable under trust or contract theories, our 1972 Davis opinion, by invalidating the Department's approval, eliminated any liability under Sangre's breach of contract/breach of trust theories.
 
 III
 
 22
 Sangre raises other claims, the viability of which depends upon whether the United States waived its sovereign immunity. In the absence of statutory authority to the contrary, the United States' immunity from suit is presumed. See United States v. Shaw, 309 U.S. 495, 500-01, 60 S.Ct. 659, 661, 84 L.Ed. 888 (1940). The debate in this case centers around whether Congress intended to waive the United States' sovereign immunity when it enacted Public Law Number 96-549:
 
 
 23
 Jurisdiction is hereby conferred on the United States District Court for the District of New Mexico to hear, determine, and render judgment on any legal claim for damages, under existing law, that the Sangre de Cristo Development Company, Incorporated, may have against the United States arising from the action of the United States in the initial approval and subsequent disapproval of the lease ... or from the preparation of the environmental impact statement attendant to such lease. Such action must be filed within one year from the date of enactment of this Act and jurisdiction conferred by this section includes jurisdiction of any setoff, counterclaim, or other claim or demand whatever on the part of the United States against such corporation.
 
 
 24
 Pub.L. No. 96-549, 94 Stat. 3220, Sec. 3 (1980) (emphasis added). Specifically, the parties disagree as to the meaning of the phrase "under existing law." Sangre contends that "under existing law" refers to common law. In other words, Sangre argues that so long as its claim is cognizable under common law, Sangre is entitled to bring it in federal court. The United States responds by arguing that Pub.L. No. 96-549 is merely a jurisdictional statute conferring jurisdiction on the United States District Court for the District of New Mexico, and that it does not provide Sangre with any substantive causes of action. The United States argues that Sangre must look to "other existing law" in order to find a waiver of the United States' sovereign immunity. Both sides agree that if the United States is correct, Sangre must bring its claims under the Federal Torts Claims Act (FTCA), specifically 28 U.S.C. Secs. 2674 & 2680. The resolution of this issue is critical because several of Sangre's claims cannot make it past the Federal Tort Claims Act, including Sangre's tortious interference with contract claim and its misrepresentation claim, both of which are barred under 28 U.S.C. Sec. 2680(h).
 
 
 25
 In Ruckelshaus v. Sierra Club, 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), the Court held that "[w]aivers of immunity must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires." Id. at 685, 103 S.Ct. at 3278 (quotations, citations, and brackets omitted). Applying this rule of strict construction convinces us that the "under existing law" language contained in Pub.L. No. 96-549 does not refer to all claims under the common law, and it should not be construed to broaden the waiver of sovereign immunity expressly set forth in the FTCA.
 
 
 26
 The applicable legislative history is not adequate to convince us otherwise. The relevant portions of the House Report provide as follows:
 
 
 27
 Section 3 of the substitute would authorize [Sangre] to file any claim that it might have against the United States under existing law with the U.S. District Court. The Committee wishes to make very clear its understanding and intent that neither this section nor anything else in the Act creates a claim against the United States. All this section is intended to do is to permit the corporation to sue the United States if it is not otherwise authorized to do so. Any legal claim it may have against the United States arising out of the subject transaction must be grounded on some existing law.
 
 
 28
 . . . . .
 
 
 29
 Section 3 confers jurisdiction on the U.S. District Court of New Mexico over any action filed by the corporation for damages against the United States arising out of the lease transaction. The section does not create a cause of action against the United States which does not already exist under existing law. It merely 'opens the court house door' if the corporation does not have any existing authority to sue the United States.
 
 
 30
 H.R.Rep. No. 96-1408. 96th Cong., 2d Sess. 4-5 (1980). Both parties contend that this expression of legislative intent supports their argument. In fact, this legislative history is ambiguous, and it does not enable us to resolve the ambiguity in the statute itself. As noted above, an ambiguous statutory reference will not be sufficient to waive sovereign immunity. A waiver will be found only when the language is clear and compelling. Ruckelshaus v. Sierra Club, supra. Construing Pub.L. No. 96-549 strictly, we must therefore find that it does not enlarge the waiver of sovereign immunity found in the FTCA, whatever other benefits it may have conveyed to Sangre in terms of vesting jurisdiction in the United States District Court for the District of New Mexico,[4] extending statutes of limitations, and eliminating other procedural requirements. It does not, however, create enforceable substantive rights. See United States v. Testan, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Thus, we deny Sangre's claim that when Congress enacted Pub.L. No. 96-549, it intended to waive the United States' sovereign immunity.
 
 IV
 
 31
 The last issue we address is whether the district court erred when it found against Sangre on its negligence claim. We review the district court's factual finding that the United States was not negligent under the clearly erroneous standard. Moreno v. Stahmann Farms, Inc. 693 F.2d 106, 108 (10th Cir.1982).
 
 
 32
 Sangre alleges that the United States was negligent in its preparation of the EIS and that this negligence unduly delayed the finalization of the EIS, which in turn proximately caused Sangre's loss. Assuming that Sangre is complaining here of only actionable nondiscretionary acts that contributed to the delay in the completion of the EIS, we find that the district court's findings of fact and its conclusion that the United States did not act negligently were not clearly erroneous. The district court's findings and conclusions on the issue of negligence are amply supported in the record, and accordingly we affirm the district court on this issue.
 
 
 33
 Accordingly, we AFFIRM the district court's order and judgment.
 
 
 
 [1]
 NEPA had been enacted before the Department's May 2, 1970 attempt to approve the lease--indeed, even before the Pueblo and Sangre reached their agreement in April of 1970
 
 
 [2]
 The Superintendent was a United States Government employee responsible for administering Klamath Indian assets for the benefit of the Klamath Indians
 
 
 [3]
 The statutes involved there were held to have created a trust status for the land, with the United States as trustee and the Indians as beneficiaries
 
 
 [4]
 We note that the headnote for section three of the statute is entitled "Jurisdiction."